**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-23-00043-CR
_____

**AMESTY HALEY SMITH, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the Criminal District Court
Jefferson County, Texas
Trial Cause No. 20-34498

**MEMORANDUM OPINION**

A jury found Amesty Haley Smith guilty of murder, a first-degree felony. *See* Tex. Penal Code Ann. § 19.02(b), (c). The jury assessed Smith's punishment at forty-five years of imprisonment with no fine. *See id*. § 12.32. In a single issue, Smith challenges the sufficiency of the evidence to support the conviction. We affirm.

**Background**

The State alleged the following in its indictment,

**AMESTY HALEY SMITH**, hereafter styled the Defendant, on or about the 12th day of OCTOBER, TWO THOUSAND AND NINETEEN, and anterior to the presentment of this indictment, in the County of Jefferson and State of Texas, did then and there intentionally and knowingly cause the death of an individual, namely [G.T.], hereafter styled the Complainant, by stabbing and cutting Complainant with a deadly weapon, to-wit: a knife[.][1]

## Jessica Jones

Jessica Jones testified that in October 2019, she worked as a General Manager at Wendy's with G.T. G.T. worked the night shift at the restaurant four days a week. Jones testified they were friendly work associates. Jones noticed a change in G.T., testifying that when he started working at the restaurant G.T. was a "happy person[,]" but, that changed, and G.T. was not as happy as he used to be coming to work. At the same time, she started to notice bruises on G.T.'s face and arms. When this became a common occurrence, Jones asked G.T. about the source of his injuries, and he told her it was "my old lady." Jones stated G.T.'s girlfriend named Amesty called the restaurant often and came to the restaurant. Jones testified Smith would call and threaten the restaurant several times a week. Smith told whoever answered the phone, "If I find out if [G.T] is up there sleeping or messing with any one of y'all up there, then we're going to have a problem." When Smith threatened to come to

---

[1]We refer to the victim, his family, and civilian witnesses by pseudonyms to conceal their identities. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

2

the restaurant, Jones alerted the police, but Smith never appeared at the restaurant after making threats. One night, G.T. went to speak to Smith outside, and "[t]hey started fighting." Jones described the altercation as follows.

> I saw where his head was into the vehicle like someone was pulling his hair into the vehicle. I see[] the hands being swung. We were told not to go outside to get into the altercation, but I did stand by the window and see hands being swung. After that I see[] him get dragged into the vehicle, and they sped out of the parking lot.

G.T. did not return to work that night but appeared two days later with a black eye and bruised arm. Jones testified that the restaurant would close for the night and the employees would generally leave about 12:30 or 1:00 a.m. She described G.T.'s demeanor as "[s]cared" if he did not get off work at a certain time, because "he would have problems at home." According to Jones, this occurred within two weeks before he was killed.

**Walter Flores**

Detective Walter Flores testified that on October 12, 2019, he arrived at Pebble Creek Apartment complex in Port Arthur in response to a dead body found at the complex. While Flores was assessing the scene, including attempting to speak to Smith's twin sister, Smith arrived at the apartment complex.[2] Flores identified Smith in court. According to Flores, Smith immediately told him that "her boyfriend

---

[2]Flores testified he believed Smith's twin sister was Smith when he spoke to her that day.

3

had hit her[,]" and he observed scratches on her face. A copy of Flores's body camera video was admitted into evidence. Flores testified Smith willingly gave a statement at the police station. According to Flores, Smith appeared "brokenhearted[,]" but he never saw tears in her eyes. Smith told the officers that the couple had a fight that started in the apartment and moved to the car, at which time G.T. hit her with a floor mat, she attempted to calm him down, he threatened her and then got out of the car, and Smith "burnt out" of the parking lot.

**Tom Barboza**

Detective Tom Barboza of the Port Arthur Police Department testified he was called to Pebble Creek Apartment complex on October 12, 2019, because a dead body had been found at the complex. When he arrived, several other officers were already on the scene. Photographs taken from that morning were entered into evidence. Barboza testified that G.T.'s body was found in a bush by the curb. G.T.'s personal belongings and Smith's cell phone were also found near his body. Barboza testified that G.T. had a stab wound, but Barboza did not observe any bruises on G.T.'s body. He also had blood on his chin, which Barboza believed occurred after he fell. According to Barboza, there were no eyewitnesses to the stabbing, but someone saw a car leaving the apartment complex and a body falling out of the trunk of that vehicle. Barboza obtained the witness's description of the car that left the parking lot.

4

Barboza later interviewed Smith at the police station. Before the interview, Barboza read Smith her *Miranda* warnings, and she eventually agreed to an interview at the police station. A video copy of the interview was admitted at trial. Barboza described Smith's demeanor during the interview to the jury.

> Her demeanor really stood out to me. It seemed like it was an off-and-on switch where there was someone addressing her or someone in the room, her emotional state seemed to be like she was sad, crying. And then seemed like when no one was there, nobody was watching, it kind of flipped off to just being her.

> [...]

> Doesn't seem like there was any sincere -- any -- it doesn't seem like she was sincerely saddened by [G.T.'s] death more than the situation that she was in. I've been in law enforcement for 13 years. Talked to a lot of people, met a lot of people, been alive for 45 years, and it's -- like I said, her demeanor wasn't one of being saddened by [G.T.'s] death.

According to Smith, she and G.T. argued in her car, he got out of the car, and Smith drove off. Copies of the apartment complex security videos were admitted at trial, and Barboza discussed their contents. According to Barboza, around 3:00 a.m. on October 12, the video shows the vehicle entering the apartment complex and parking. Later at 6:46 a.m., the video shows the same car leaving the apartment complex, and Barboza identified Smith as the driver at that time based on her clothing. The car then stops and sits for quite a while. Smith is then seen exiting the vehicle, going to the trunk of the car, then going back towards the car door. Barboza testified Smith then reaches inside and the car's trunk opens. G.T. exits the vehicle,

5

and according to Barboza, "[G.T.] walks around, engaged. [Smith] reaches down, and they make contact, and you can immediately see [G.T.] …. He seems to kind of stumble. It appears that he grabs his chest area with his left -- left hand." Smith enters the car through the passenger door and then closes both doors. At that point G.T. goes into the trunk. The vehicle is then seen going out of the apartment complex's gate, where there is another car belonging to the witness who saw G.T. "hanging out of the trunk." According to Barboza's description of the video, G.T. stumbles off and falls to the ground where he is later found dead. Barboza said the video did not match the story that Smith told during her interview. Barboza testified that after leaving the apartment complex, Smith went to Stripes convenience store and called 911. She then left the convenience store, went to her mother's home and put her vehicle in her mother's garage, which Barboza interpreted as an attempt to hide the car. Smith then went to an orientation for her new job at Walmart.

**Faith Clark**

In the early morning of October 12, 2019, Faith Clark was delivering newspapers in Port Arthur. As she turned into Pebble Creek Apartment driveway, a car came out of the parking lot at "full speed[,]" and "almost sideswiped" her. According to Clark, the car "never stopped." As the car drove past her, it hit a bump, the trunk popped open, and a black male fell out of the trunk. As he rolled out, Clark heard him say "ouch." She then observed him try to get up, but he could not do so

6

on his first attempt; then, "when he finally made it up," she kept going. She went into the apartment complex, delivered her newspaper, and as she exited the complex, she saw the man walking. She stopped at the stop sign preparing to turn, but "[n]ext thing, I looked to the left, he was facedown." Thinking it was none of her business, she left, but before traveling very far, she made a U-turn, came back and called 911. Clark could not identify the person driving the car that G.T. fell out of.

**Rachel Stone**

Rachel Stone testified she was a resident of Pebble Creek Apartment complex in October 2019. According to Stone, on the morning of October 12, 2019, she had to be at work at 6 a.m. Stone went out to warm up her car and stayed in the car for a little while defrosting her car. Stone then heard "noise" coming from another car. Stone noticed someone loudly honking in the other car and the car door opening and closing. She testified that the yelling from inside the other vehicle was so loud she heard it in her vehicle. Stone could see hands moving around inside the car, but no one got out of the car. Stone then left the parking lot.

**Alice Sanders**

Alice Sanders testified that in October 2019 she was working as a cook at Stripes gas station. On October 12, 2019, Smith came into Stripes around seven o'clock in the morning. A video of Smith inside of Stripes was admitted into evidence based on Sanders' testimony identifying Smith as the woman on the video.

According to Sanders, Smith entered the store and asked to use their phone to call 911 because she and her boyfriend had been fighting, and he had taken her phone. Sanders testified that Smith appeared "scared" and that she remained at the gas station for about five or ten minutes before leaving. Before she left, Smith placed a second phone call during which Sanders heard Smith ask someone if she could put her car in their garage. Smith did not wait for the police to show up. Sanders observed scratches on Smith's face but Smith did not ask for medical help.

**Sharon Jacobs**

Sharon Jacobs was also working at Stripes on October 12, 2019. She identified Smith and stated she went to high school with both Smith and G.T. When Smith came into Stripes that morning, Jacobs was in the restroom. When Jacobs left the restroom, Smith was already on the phone talking to someone asking if she could put her car in their garage. Jacobs testified that Smith did not have her phone and she heard Smith say that someone took her phone and that they had argued. Jacobs did not observe any injuries on Smith. She testified Smith appeared to be "stressed out" as if she were "going through something[.]"

**Kay Brown**

Kay Brown testified that in October 2019 she was the human resources manager at Walmart in Port Arthur. On October 12, 2019, Smith arrived at Walmart around 8:00 that morning for orientation of a new job position. A video of Smith at

the Walmart store was admitted into evidence based on Brown's identification of Smith on the video. Brown testified Smith appeared to be fine and did not have any visible injuries when she arrived at Walmart that morning. Brown stated Smith arrived early and sat for quite a while before she received a phone call. After Smith got off the phone call, she appeared upset and told Brown that one of her grandparents passed away. Smith then left Walmart and did not return to the job.

**Gloria Gonzalez**

Gloria Gonzalez testified she is a patrol officer with the Port Arthur Police Department. On October 12, 2019, she was dispatched to Pebble Creek Apartments because a dead body was found on the premises. On her way, she was rerouted to Stripes gas station in relation to a 911 call placed from that location. Dispatch believed the call from the gas station may have been related to the call regarding the dead body at the apartment complex. She remembered being told a black female called 911 "stating that she was assaulted by a black male[.]" When she arrived, she learned the caller had left. Gonzalez then spoke to the Stripes clerks and reviewed the video footage. Gonzalez's body camera footage was admitted into evidence and played for the jury.

Gonzalez was then dispatched to another location where police believed they had a suspect in custody. This was revealed to be Smith's twin sister, but Smith and her mother also appeared at the scene later. Although Gonzalez did not speak with

9

Smith, she observed her demeanor both at the scene and at the police station later. She described Smith as appearing "shocked," but also explained it "seemed like she was acting to me." Gonzalez testified that Smith appeared to have "crocodile tears[,]" and that "[f]rom the moment I had put her in my patrol unit till then, till after the interview, pretty much when the interview was complete, she just completely stopped being emotional[.]" She observed that Smith had a scratch under her eye. Gonzalez testified they tested a knife and Smith's clothing for the presence of G.T.'s blood and there was not a match.

**Timothy Fagen**

Dr. Timothy Fagen testified he is a forensic pathologist and conducted the autopsy on G.T. He detailed the processes and procedures in conducting an autopsy and described the autopsy he performed on G.T. Pictures of the autopsy were admitted without objection. Fagen identified a stab wound on the left side of G.T.'s chest, explaining it was a "lethal injury[,]" and noting G.T. had other non-lethal injuries.

**Defense Witnesses**

Two witnesses testified for the defense.[3] First, Calvin Smith testified he is Smith's younger brother, and in October 2019, he lived with his mother in Port

---

[3]These witnesses and the appellant share the same last name, so we will refer to the witnesses by their first names.

Arthur. On October 12, 2019, Calvin was asleep in his room when he was awakened by his mother. She asked him to take Smith to her job orientation at Walmart. He testified that at the time, his sister did not have a place to live and that she was dating G.T. Smith was staying with her twin sister at Pebble Creek Apartments. Smith told Calvin that she and G.T. had a fight, and he noticed a scratch on her face but did not ask her about the source of the scratch. After he dropped his sister off at Walmart, he then went to Pebble Creek Apartments because "I wanted to see what was going on or why she had the scratch on her face."

When Calvin arrived at the apartment complex, he observed police officers and medical personnel and learned that G.T. had died. He then called Smith to tell her that G.T. was dead and went back to Walmart to get Smith. Calvin testified that Smith did not believe G.T. was dead and believed her reaction was genuine. After he picked up Smith from Walmart, they returned to his mother's home and then all three traveled back to the apartment complex. The police then took Smith to the police station, and Calvin went home. He testified that he never observed any blood on Smith, and it appeared she was wearing the same clothes all day.

Next, Smith's mother, Estelle Smith, testified. According to Estelle, Smith and G.T. were in a relationship and were living out of their car at the time of G.T.'s death. During this time, Smith would stay at Estelle's house or at her twin sister's apartment. Early in the morning on October 12, Smith called Estelle from Stripes

11

convenience store. She told Estelle that she did not have gas money and that she was coming to her house. When she arrived, Smith told Estelle something was wrong with her car, so Estelle told Smith to leave the car in her garage. Estelle noticed a scratch on Smith's face but denied that Smith was disheveled or had blood on her. Estelle testified she had plans to have a friend look at Smith's car. According to Estelle, Smith did not leave the car in the driveway because her car was filled with personal items, and she did not want someone damaging the car or taking Smith's belongings. Smith's brother then took Smith to Walmart for her job orientation. Smith and Calvin later returned to her home, and all three went to Pebble Creek Apartments. Estelle denied telling Smith to hide her car or that Smith was trying to hide her car in Estelle's garage. Smith did not testify.

**Video Footage**

State's Exhibit 1A shows a vehicle with damage on the passenger side door entering the Pebble Creek Apartment complex around 3 a.m. in the morning. The car is then seen speeding through the apartment complex and parking. At 6:46 a.m. the car leaves the parking spot and goes back through the apartment complex parking lot. The car stops, and a light comes on in the car. Another person is seen getting into a vehicle perpendicular to the car. After some time has passed, the other car then leaves. The driver, identified on the video as Smith, then exits the vehicle. A person identified as G.T. on the video then exits the vehicle on the passenger side. The trunk

of the car is then opened and the Smith and G.T. fight. Smith then reenters the vehicle through the passenger side door and closes the passenger door and driver side door while G.T. is still outside the vehicle. The car then drives off with the trunk flapping open. The car is observed speeding through the parking lot, and the trunk continues to flap open. As the car is exiting the apartment complex parking lot, a person is identified in the trunk of the car, which the video identifies as G.T. Another vehicle, identified as a witness, attempts to enter the apartment complex parking lot as Smith's car exits the parking lot. The witness's car is forced to stop and then backs up. The video identifies G.T. as he walks in front of the witness's car and falls to the ground near some bushes. The video then shows another viewpoint of the physical altercation between Smith and G.T.

At the conclusion of trial, the jury found Smith guilty and, after a separate hearing for punishment, sentenced her to forty-five years' incarceration. Smith timely appealed.

**Sufficiency of the Evidence**

In a single issue, Smith challenged the sufficiency of the evidence to support the conviction. Specifically, Smith argues that "[t]he evidence establishes that the parties engaged in an altercation, some of which is depicted by video evidence and some of which is described by witnesses, [but] Appellant submits that there is no compelling evidence to establish that appellant actually caused the death of [G.T.]

13

beyond a reasonable doubt." Smith points to the lack of eyewitness testimony as to G.T.'s death and argues that the video does not clearly establish the cause of G.T.'s death.

A person commits the offense of murder if he "intentionally or knowingly causes the death of an individual[.]" Tex. Penal Code Ann. § 19.02(b)(1). "A person acts intentionally, or with intent, with respect . . . to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a).

The jury may infer the intent to kill from the defendant's acts, words, or conduct, including the use of a deadly weapon. *Hall v. State*, 418 S.W.2d 810, 812 (Tex. Crim. App. 1967) (quoting *Kincaid v. State*, 198 S.W.2d 899, 900 (Tex. Crim. App. 1946)); *see also Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (stating intent may be inferred from circumstantial evidence such as acts, words, and conduct of accused); *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003) (concluding a jury may infer intent from any facts in evidence it believes prove the existence of that intent, such as the use of a deadly weapon). If the record supports conflicting inferences, we must presume that the fact finder resolved the conflicts in favor of the prosecution and defer to that determination. *See Jackson*, 443 U.S. at 326. "Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as

14

the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Ramsey v. State*, 473 S.W.2d 805, 809 (Tex. Crim. App. 2015) (citing *Hooper*, 214 S.W.3d at 13) (other citations omitted).

The jury is the exclusive judge of the credibility of the evidence and the weight to be given to that evidence. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). As such, the jury is responsible for resolving conflicts in the testimony, is free to believe some, all or none of a witness's testimony, and may assign as much or as little weight to a witness's testimony as it sees fit. *Id*. Jurors may also draw reasonable inferences from the evidence. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Id*. at 16.

When examining whether a criminal conviction is supported by legally sufficient evidence, we compare the evidence to the elements of the offense as defined by a hypothetically correct charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). We consider all the evidence, viewed in the light most favorable to the verdict, along with the inferences that could reasonably be drawn from the evidence. *Hooper*, 214 S.W.3d at 13. We do not assess the credibility of the evidence, reweigh the evidence, nor substitute our judgment for that of the jury. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

The evidence is legally sufficient to support the conviction if any rational trier of fact could have found each of the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). "Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (citation omitted); *see also Garcia v. State*, 667 S.W.3d 756, 761-62 (Tex. Crim. App. 2023) (citation omitted) ("A proper review of evidentiary sufficiency considers the cumulative force of the evidence.").

First, the jury heard evidence that Smith was abusive towards G.T. before his death, and she was jealous and controlling in their relationship. The jury also heard evidence that Smith and G.T. had an argument in her car in the early morning hours of October 12, 2019. The jury saw video evidence of Smith and G.T. engaging in a physical altercation outside of her car. Witnesses testified that during the altercation, G.T. grabbed his chest and fell into the trunk of Smith's car. Testimony from the forensic pathologist revealed G.T. ultimately died from a lethal stab wound to the left side of his chest. Smith hastily drove to the exit of the apartment complex parking lot with G.T. in the trunk. As Smith was leaving the parking lot, G.T. fell out of the trunk, staggering and collapsing in the bushes by the entrance of the apartment complex. Testimony indicated Smith almost hit a car as she was leaving

16

the parking lot and then immediately went to a convenience store and called 911. She then placed another call and asked to put her car in someone's garage. After leaving the convenience store, Smith parked her car in her mother's garage. Smith's brother drove her to a job orientation at Walmart, and according to witness testimony, she appeared normal until she received a phone call. Her brother testified that after he dropped Smith off at Walmart, he drove to the apartment complex and saw police and medical personnel and learned G.T. was dead, at which time he called Smith at Walmart and gave her the news. According to investigating officers, her statements about what happened that morning between her and G.T. did not match video footage and witness testimony, and the officers believed her reaction to G.T.'s death was insincere.

Having viewed the evidence in the light most favorable to the verdict, we conclude that a rational factfinder could have found beyond a reasonable doubt that Smith was the person who caused G.T.'s death. *See Jackson*, 443 U.S. at 319; *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim App. 2013). The jury was able to assess the credibility and demeanor of the witnesses who testified at trial, and we presume that the jury resolved all conflicts in the testimony, weighed the evidence, and drew reasonable inferences from the evidence in a manner that supports the verdict. *See Jackson*, 443 U.S. at 319; *Temple*, 390 S.W.3d at 360; *Hooper*, 214 S.W.3d at 13. The jury could have reasonably inferred from the direct and

circumstantial evidence, including the events depicted on the video footage presented, that Smith stabbed G.T. in the chest and caused his death. "This was not a determination so outrageous that no rational trier of fact could agree." *Wirth v. State*, 361 S.W.3d 694, 698 (Tex. Crim. App. 2012). We conclude that the cumulative force of the evidence is sufficient to support Smith's conviction for murder. *See Jackson*, 443 U.S. at 319; *Temple*, 390 S.W.3d at 359; *Hooper*, 214 S.W.3d at 13. We overrule Appellant's sole issue on appeal.

AFFIRMED.

KENT CHAMBERS
Justice

Submitted on October 15, 2024
Opinion Delivered February 19, 2025
Do Not Publish

Before Golemon, C.J., Wright and Chambers, JJ.